952 A.2d 640

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**David Allen SATTAZAHN, Appellee.**

**Commonwealth of Pennsylvania, Appellee**

v.

**David Allen Sattazahn, Appellant.**

**Commonwealth of Pennsylvania, Appellee**

v.

**David Allen Sattazahn, Appellant.**

Supreme Court of Pennsylvania.

Submitted April 18, 2007.

Decided July 24, 2008.

See also, 869 A.2d 529.

Christopher D. Carusone, Philadelphia, Alisa Rebecca Hobart, Berks County District Attorney's Office, Amy Zapp, Harrisburg, for Commonwealth of Pennsylvania.

Robert Brett Dunham, Defender Association of Philadelphia, Philadelphia, for David Allen Sattazahn.

Before CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Justice SAYLOR.

In this capital post-conviction appeal, the Commonwealth, as the designated appellant, challenges the award of a new penalty hearing, and the appellee seeks to overturn his convictions, among other relief.

In April 1987, Appellee shot and killed Richard Boyer, a restaurant manager, during a robbery. Appellee was initially

tried and convicted of first-degree murder in 1991, when he received a life sentence on account of sentencing jury impasse. *See* 42 Pa.C.S. § 9711(c)(1)(iv). According to his attorney, Appellee was advised that, if he prevailed in obtaining a new trial on appeal, the Commonwealth would be foreclosed from again seeking the death penalty. Appellee lodged the appeal in the Superior Court and was awarded a new trial.

The retrial ensued in 1999, at which Appellee was represented by new counsel, who was appointed a few months previously. The Commonwealth did, again, pursue imposition of the death penalty. In the guilt phase, among other evidence, the prosecution presented testimony from Appellee's accomplice, Jeffrey Hammer.[1] Hammer explained that he and Appellee hid outside the Heidelberg Family Restaurant after close of business with .41 and .22 caliber weapons, respectively, planning to rob the manager, handcuff him, and leave him in his truck. When the pair confronted the victim but he did not cooperate, Hammer related, Appellee shot Mr. Boyer repeatedly with the .22 caliber pistol. Further, Hammer indicated that the coconspirators placed the weapons and masks in a black bag and escaped in an all-terrain vehicle, but that the bag was lost during the travel.

Another witness, Fritz Wanner, testified that he overheard a subsequent conversation, conducted in a garage or barn, in which Appellee chastised Hammer for losing the bag and threatened to kill him and/or members of his family if their identities were discovered. According to Wanner's testimony, Appellee also complained that he had to grab the firearm from Hammer and shoot the victim after Hammer had shot and missed. Wanner said that he was able to see the participants in the conversation and that a person named Joe (later identified as Joseph Russo) was also present. Finally, although Wanner was facing sentencing in a pending prosecution, he stated that he did not expect to receive favorable treatment from the Commonwealth in exchange for his testimony.

1. Pursuant to a plea agreement, Hammer pled guilty to third-degree murder and received a sentence of incarceration for 19 to 55 years.

Another significant item of the Commonwealth's evidence was the bag lost by the coconspirators and its contents, including the .22 caliber handgun used to perpetrate the robbery/killing. Through a recovered serial number and testimony from a firearms dealer, the Commonwealth established that this weapon belonged to Appellee.

At the conclusion of the guilt phase, the trial court issued a charge concerning reasonable doubt utilizing phraseology different from that suggested in standard jury instructions. Rather that indicating that a reasonable doubt is one that would cause a reasonably careful and sensible person to "hesitate" before acting upon a matter of importance in his own affairs, PENNSYLVANIA SUGGESTED STANDARD JURY INSTRUCTIONS § 7.01(3) (1979), the trial court described a reasonable doubt as "a kind of doubt that *refrains* a reasonable person from acting in a manner of importance to himself or herself." N.T., January 21, 1999, at 498 (emphasis added). Further, the court took it upon itself to advise the jurors of the penalties associated with the different degrees of murder. *See id.* at 512.

After Appellee was found guilty of first-degree murder, robbery, and related offenses, a penalty hearing ensued, at which the Commonwealth advanced the aggravating circumstances entailing the commission of a killing during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6), and the accumulation of a significant history of violent felony convictions, 42 Pa.C.S. § 9711(d)(9). Of particular relevance to one of Appellee's present claims, the convictions relied upon by the Commonwealth in support of the (d)(9) aggravator, including one for third-degree murder, occurred after his initial trial in this case. Appellee offered brief testimony from his mother and a former employer in support of the catchall mitigator, 42 Pa.C.S. § 9711(e)(8). The jurors found that the Commonwealth had established the aggravators beyond a reasonable doubt and that their weight exceeded that of the mitigation found by any juror.

On direct appeal, still represented by his trial counsel, Appellee challenged, *inter alia*, the constitutionality of permit-

ting the Commonwealth to seek the death penalty on retrial, after he had received a life sentence at his initial trial. This Court rejected such challenge, *see Commonwealth v. Sattazahn*, 563 Pa. 533, 763 A.2d 359 (2000),[2] and this decision was sustained by the United States Supreme Court, *see Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003).

In June 2003, Appellee filed a *pro se* petition seeking relief under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541–9546 (the "PCRA"). The PCRA court appointed counsel, and an amended petition was filed, with supplements ensuing. Appellee asserted, *inter alia*, that: the Commonwealth suppressed exculpatory evidence and knowingly failed to correct false trial testimony; trial counsel was ineffective at the guilt phase of trial for failing to gather available impeachment materials and adequately cross-examine Commonwealth witnesses; the trial court improperly instructed the jury concerning comparative penalties for the different degrees of murder; the court provided a constitutionally defective charge concerning reasonable doubt; trial counsel was derelict in assuring Appellee that the Commonwealth was foreclosed from seeking the death penalty upon retrial; and trial counsel inappropriately failed to investigate and present an adequate case of mitigation in the penalty phase.

In the post-conviction hearings, as concerns the asserted discovery violations, Appellee developed that, in a March 1991 prison interview with Hammer conducted by the district attorney, Hammer had contradicted aspects of Wanner's version of the overheard conversation, at least to the extent Wanner had said Russo was present. At some point, the district attorney prepared notes concerning this meeting; however, the post-

---

**2.** This author dissented, albeit while recognizing the validity of the majority's holding as a matter of constitutional law. *See Sattazahn*, 563 Pa. at 552, 763 A.2d at 369 (Saylor, J., dissenting) ("In my view, the ends of justice would be better served if, in our supervisory role respecting the administration of capital cases in Pennsylvania, we were to require that such a defendant, if convicted upon retrial, must receive the life sentence originally imposed. Such a requirement would be consistent with the legislative intent that if even a single juror decides against the death penalty, the penalty will not be imposed.").

conviction evidence was in conflict concerning the timing of the preparation of these notes and the entire content of the underlying interview. On the one hand, the prosecutor testified that his notes were prepared one or two weeks after the meeting, and thus, did not reflect contemporaneous, verbatim responses from Hammer. The district attorney also related that he did not show Wanner's statement to Hammer or specifically discuss the contents with him. According to the prosecutor, Hammer said he was unsure whether someone else besides himself and Appellee was present. Hammer, on the other hand, indicated that notes generally were taken during interviews with him. Further, he testified that the prosecutor did show him Wanner's statement, and he expressed a belief that he had marked the portions of the statement that he claimed were false, including Wanner's statements that Russo was present and that Appellee said that he had grabbed the murder weapon from Hammer. The postconviction evidence strongly suggested that the prosecutor did not make his notes from the interview available to the defense.[3]

Wanner also testified in the post-conviction proceedings. Contrary to his trial testimony, Wanner said that he could not see Appellee and Hammer during the disputed conversation, and he disclaimed his prior assertion that Russo was present. Instead, Wanner indicated that someone pulled up in a car, but he did not know the person's identity. Further, Wanner testified that he did not remember anyone talking about firing shots. Finally, although he reiterated that the Commonwealth had made no "deal" concerning his own sentencing in the unrelated prosecution against him, Wanner said that the prosecutor had said he would "see what he could do" in that case. Appellee bolstered this evidence by introducing a representation of an assistant district attorney upon Wanner's

3. When asked whether his notes were ever disclosed to the defense, the district attorney initially stated that his notes were in the case file, and that his office maintains an open-file policy. See N.T., July 13, 2006, at 26. When pressed, however, the prosecutor admitted that he did not disclose work product and that his position was that his notes concerning the conversation with Hammer represented work product. See id. at 26–33.

sentencing that, "I have no doubt that that sounds exactly like the kind of thing that [the district attorney] would say. That's our general policy with regards to cooperation. I simply have no knowledge of it."

Finally, Appellee highlighted that the district attorney had committed to provide broad discovery but he did not furnish various documents that Appellee deems relevant, particularly for impeachment purposes.[4]

As concerns the penalty-phase claim of deficient steward-ship in the investigation and presentation of mitigating evidence, at the outset, Appellee proffered evidence of his markedly poor performance in school, including his demonstration of poor attention and concentration; difficulty functioning; poor grades and ranking in the bottom ten percent of his classes; repeating of three grades (kindergarten, second, and seventh grades); eventual placement in a special class; disengagement from ordinary social activities; and departure from school at age seventeen, while in the ninth grade. According to Appellee's two mental-health professionals, a neuropsychologist and a psychiatrist, such record reflected a long history of learning disabilities and abnormal social development, thus presenting many "red flags" suggesting cognitive impairment or organic brain defect. Both experts testified that Appellee suffered from such impairments, including cognitive disorder; moderate to severe attention deficit hyperactivity disorder;

4. These include: copies of the plea agreement showing that some of the crimes to which Hammer had originally committed to plead guilty were subsequently deleted from the final agreement; transcripts and court documents showing that, in 1993 in Lebanon County, Hammer had a sentence modified from 19 to 45 years to 12 to 32 years after a proceeding in which his attorney stressed his cooperation in Appellee's prosecution; a court order from Schuylkill County ordering Hammer to cooperate with the Commonwealth "with any cases against Mr. Satta-zahn"; a preliminary hearing transcript in Schuylkill County in which Hammer testified that, when he gave a statement to state police in July 1989, they told him they would do whatever they could do to help him; Hammer's testimony at trial in Schuylkill County that, in exchange for his statement, a state trooper promised Hammer he would talk to the district attorneys and "do the best he could" for Hammer; and information that, in the course of negotiating a plea agreement in return for testifying against Appellee, Hammer, through his attorney, told a Berks County prosecutor that he wanted to serve no jail time.

chronic brain dysfunction; Aspergers syndrome or an Aspergers-like condition; and pervasive developmental and schizotypal personality disorders. Elaborating on his finding of "extreme evidence of chronic brain damage," the neuropsychologist explained that:

[Appellee's] overall brain dysfunction is significant enough to have major impacts on his ability to function and how he comports himself within the community, and ... such impacts [and] effects from this brain damage [are] of great significance [in] understanding this person's behavior and how he functions in life.

N.T., January 21, 2005, at 149. Both professionals explained the impact in terms of impaired impulse control, susceptibility to influence of others, and disorganized behavior in times of stress. Both also related their findings to the mitigating circumstances entailing severe mental or emotional disturbance and lack of capacity to understand the criminality of conduct and conform one's behavior to requirements of the law. See 42 Pa.C.S. § 9711(e)(2), (3).

Appellee's trial counsel also testified, indicating that he was appointed three months prior to trial; he received no cooperation from Appellee's prior attorney; in his investigation, he hired an investigator and obtained school and Department of Corrections records and spoke with Appellee's mother, a Department of Corrections' representative, and perhaps a school teacher; he was aware that Appellee had not advanced regularly in several grades; he knew that Appellee had been placed in a special class; and he knew of blows to the head suffered by Appellee. Nevertheless, counsel did not arrange for a mental-health examination. He noted, at various points in his testimony, that Appellee's mother gave him no indication of a psychiatric history, and that there were indications in Appellee's prison records that he had no mental illnesses. Counsel also indicated, however, that he did not know signs of cognitive disorder, see N.T., January 20, 2005, at 96 (reflecting counsel's response to a question concerning his knowledge of "No, I am not a psychiatrist"). Further, he confirmed his awareness that, consistent with 1980 American Bar Associa-

tion guidelines pertaining to representation of capital defendants, he had an obligation to conduct a thorough penalty phase investigation. *See* N.T., January 20, 2005, at 28.

The PCRA court credited Appellee's claim of deficient stewardship in the investigation and presentation of mitigating circumstances and awarded a new sentencing hearing. Referencing *Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767 (2004), the PCRA court explained that capital counsel's duty to investigate and prepare mitigation evidence "encompasses pursuit of all statutory mitigators of which he is aware or reasonably should be aware, unless there is some objective, reasonable ground not to pursue the circumstance (such as when it might open the door to harmful evidence)." *Commonwealth v. Sattazahn*, No. 2194–89, *slip op.* at 44 (C.P. Berks June 16, 2006) (quoting *Malloy*, 579 Pa. at 458, 856 A.2d at 787). Applying this principle, the court explained:

> Here, [Appellee's] counsel failed to adequately investigate substantial mitigating factors, even though the record was replete with "red flags" of brain damage that indicated the need for neuropsychological evaluations. In light of the extensive medical and scientific evidence presented in the PCRA petition, and subsequent testimony at hearings regarding [Appellee's] neglectful parenting, social isolation and impaired social development, significant educational impairments and learning disabilities, odd risk-taking behaviors, organic brain damage, mental illness and other potential statutory mitigators, we find that [Appellee's] counsel, notwithstanding his late entry into the case, failed to fulfill his obligation to explore all avenues that might lead to mitigating circumstances. During the sentencing phase, counsel presented testimony from just two witnesses—Leroy Renninger and [Appellee's] mother, Betty Sattazahn—in pursuit of one mitigating circumstance: any evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. This evidence clearly established that trial counsel did not conduct a thorough investigation of his client's background to deter-

mine if more statutory mitigators existed, and there was no tactical or strategic reason for the deficiencies.

*Sattazahn,* No. 2194–89, *slip op.* at 45 (citations omitted); *see also id.* at 43–44 (explaining that trial counsel rendered deficient stewardship "in failing to interview family and other lay witnesses who were readily identifiable and reasonably available to testify; for presenting only eight pages of direct testimony in [Appellee's] case for life; for failing to obtain available institutional records; for failing to conduct any investigation into [Appellee's] psychiatric condition and mental impairments, despite obvious signs of brain damage that clearly pointed to the need to obtain the assistance of mental health experts"). According to the PCRA court, these unjustified omissions on trial counsel's part clearly prejudiced Appellee. *See id.* at 44 ("This Court found that substantial and available mitigation evidence was not presented at trial, and that this evidence was reasonably likely to have persuaded one or more jurors to find a mitigating circumstance that had not been presented.").

The court also determined, however, that Appellee's prior counsel was not ineffective in advising him that the Commonwealth could not seek the death penalty on retrial if he successfully appealed his conviction for first-degree murder. The court recognized that this Court had reached the contrary legal conclusion in *Commonwealth v. Martorano,* 535 Pa. 178, 194–95, 634 A.2d 1063, 1070–71 (1993) (applying a "clean slate" approach to capital resentencing situations, other than those in which the sentencing authority has decided that the prosecution has not proved its case, to conclude that jury deadlock does not preclude imposition of a death penalty upon retrial). Referencing *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), and *Arizona v. Rumsey,* 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984), the court reasoned that, prior to *Martorano,* and at the time the advice was rendered to Appellee, the law did appear to create an entitlement to a life sentence. *Sattazahn,* No. 2194–89, *slip. op.* at 11–12. Thus, the court determined that counsel did not render deficient stewardship.

While awarding a new penalty hearing, the PCRA court denied guilt-phase relief. Concerning the allegation of non-disclosure by the Commonwealth of the prosecutor's notes of his interview with Hammer, the court explained that, even if Appellee had known the substance of the conversation, he would have been in the "very difficult position" of arguing to the jury that Hammer was truthful in various assertions, but that the jury should not believe the remainder of his testimony. *See Sattazahn,* No. 2194–89, *slip op.* at 14. Further, the court highlighted that the Commonwealth presented other evidence corroborating various aspects of Hammer's testimony and had obtained a conviction in the first trial without it. Thus, the court opined that Appellee could not establish that any information allegedly withheld by the Commonwealth would have *changed the outcome of the trial if it had been* provided to him. *See id.* at 14–15. Finally, the court found no fault on the part of the Commonwealth in presenting inconsistent testimony from Hammer and Wanner, reasoning that:

> [T]he mere presentation of inconsistent testimony does not rise to this level [of a due process violation]. . . . The Commonwealth argued, and this Court agreed, that they [sic] simply presented the testimony of Wanner and Hammer as they recollected what took place, without judging whose version of the events was correct. It must be noted that trial counsel did not cross-examine Fritz Wanner regarding the contents of this conversation in the barn, even though [Appellee] was an actual participant in the conversation. As a[d]efendant has a duty to participate in his own defense, one can logically infer that if the content of the conversation was different than what Wanner testified to, then [Appellee] would have informed his counsel, prompting him to vigorously cross-examine him on that subject. No information in the record for these PCRA proceedings indicates that [Appellee] did so.

*Sattazahn,* No. 2194–89, *slip op.* at 20.

As concerns Appellee's claims concerning an undisclosed inducement to Wanner to testify, the PCRA court determined that Appellee failed to satisfy his burden of establishing that

an agreement, promise, or inducement in fact existed. *See Sattazahn*, No. 2194–89, *slip op.* at 24–25. While the court recognized that the district attorney's office may have maintained some general policy, it explained that the statements made on the record by Commonwealth agents did not specifically discuss whether that policy was employed in the case against Wanner. Further, the court highlighted that the assistant district attorney prosecuting Wanner's case had no knowledge of any agreement. The PCRA court concluded that "[t]he Commonwealth cannot be found to have failed to disclose an agreement which has not been proven to exist or for failing to correct testimony which has not been proven to be false." *Id.*

With regard to documents pertaining to Hammer's criminal proceedings in Schuylkill and Lebanon counties, the PCRA court regarded the materials as collateral impeachment information governed by Rule of Criminal Procedure 573(B)(2) (regulating the discretionary disclosure of information relative to witnesses). Moreover, the court reasoned that Berks County was not responsible for gathering public information from other counties to furnish to Appellee. *See Sattazahn*, No. 2194–89, *slip op.* at 15–16 (explaining that "[i]t is well settled that there is no *Brady* violation where the parties had equal access to information or if the [a]ppellant knew or could have uncovered the evidence with reasonable diligence."). As to the associated ineffectiveness claim, charging deficient stewardship for relying solely on the discovery provided by the prosecution, the Court reasoned:

> [Appellee's] second trial counsel entered into the case a few short weeks before the trial commenced and was unable to even speak to [Appellee's] former counsel regarding the case file. Furthermore, as set forth above, we found that none of [Appellee's] PCRA claims regarding ineffective assistance of counsel entitled him to relief because he did not prove that, had other evidence and/or defenses been introduced, the outcome of his trial would have likely been different. Because [Appellee] could not establish the prejudice prong of his ineffectiveness claims, this Court declined

to find his counsel ineffective on any of [Appelleee's] guilt phase claims.

*Sattazahn,* No. 2194–89, *slip op.* at 31; *accord id.* at 17 ("Jeffrey Hammer was subject to cross-examination and impeachment on several issues and it is unlikely that any additional impeachment evidence that was allegedly withheld by the Commonwealth would have changed the outcome of trial.").

The PCRA court more specifically addressed Appellee's claim that his trial counsel was ineffective in failing to cross-examine Hammer concerning his responses to questions in a polygraph examination by state police, in which he had denied participation in the robbery/killing of Mr. Boyer, and for failing to better develop the theory that, although Appellee technically owned the .22 weapon used to kill Mr. Boyer, he had purchased it for Hammer, because Hammer was underage. As concerns the polygraph examination, the court determined that counsel was precluded under applicable cases from referencing the results of such an examination. *See Sattazahn,* No. 2194–89, *slip op.* at 19–20. *See generally Commonwealth v. Brockington,* 500 Pa. 216, 220, 455 A.2d 627, 629 (1983); *Commonwealth v. Gee,* 467 Pa. 123, 142–43, 354 A.2d 875, 883–84 (1976) (plurality). Regarding the handgun purchase, the court referenced portions of the record in which trial counsel did, in fact, cross-examine Hammer concerning the purchase. *See Sattazahn,* No. 2194–89, *slip op.* at 20–21 (explaining that "[c]ounsel specifically asked Hammer if he told Harold Houser, with whom Hammer was incarcerated, that Defendant had purchased the .22 handgun for him, and Hammer twice denied this assertion.").

In response to Appellee's claim that counsel was ineffective for failing to develop that Hammer's plea agreement was modified and he had anticipated being paroled after nineteen years in prison, the court determined:

[Appellee] has not shown how counsel's failure to impeach Hammer in the retrial regarding these statements has prejudiced him. A review of Hammer's Memorandum of Cooperation and Plea Agreement indicates that any modifi-

cations were not done to give Hammer a better "bargain" in exchange for his testimony. The charges to which Hammer was going to plead but which were later deleted were scheduled to run concurrently with the charges to which he did plead. Jeffrey Hammer may have asked for no jail time, but in reality he did receive a rather lengthy jail sentence of 19 to 55 years in Docket No. 2190/89 and 6 to 20 years in Docket No. 1976/89. What he asked for in exchange for his testimony, no matter how unreasonable, was not what he received. Hammer pleaded to these crimes after the first trial, so his [sic] any "benefit" he received came well before the second trial in which he testified. Thus, any potential impeachment information that [Appellee] refers to would be speculative and questionable and certainly would not have been determinative of [Appellee's] guilt or innocence. [Appellee] has not proven how counsel's alleged failure to impeach the Commonwealth's witness Jeffrey Hammer on these matters has prejudiced him to the point that the outcome of the trial would have been different if not for counsel's omissions.

*Sattazahn,* No. 2194–89, *slip op.* at 21.

Finally, the PCRA court rejected Appellee's claims pertaining to the trial court's instructions concerning comparative penalties and reasonable doubt based upon precedent from this Court. *See Sattazahn,* No. 2194–89, *slip op.* at 32–34; *see, e.g., Commonwealth v. Brown,* 470 Pa. 274, 289, 368 A.2d 626, 634 (1976).

 In addressing the grant or denial of post-conviction relief, we consider whether the PCRA court's conclusions are supported by record evidence and are free of legal error. *See Commonwealth v. Jones,* 590 Pa. 202, 216, 912 A.2d 268, 276 (2006) (citing *Commonwealth v. Travaglia,* 541 Pa. 108, 117 n. 4, 661 A.2d 352, 356 n. 4 (1995)). Consistent with the eligibility requirements for PCRA relief, Appellee frames the majority of his claims as involving violations of the United States or Pennsylvania Constitutions, including the denial of effective assistance of counsel. *See* 42 Pa.C.S. § 9543(a)(2)(i), (ii). To prevail on his ineffectiveness allegations, Appellee must dem-

onstrate that the underlying claim is of arguable merit; that no reasonable strategic basis existed for counsel's act or omission; and that counsel's error resulted in prejudice, or, in other words, that there is a reasonable probability that the outcome would have been different. *See Commonwealth v. Pierce,* 567 Pa. 186, 203, 786 A.2d 203, 213 (2001); *see also Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984) (explaining that, to establish an ineffective assistance claim, a defendant must show that counsel's performance was deficient and that such deficiencies prejudiced the defense). Counsel is presumed to have rendered effective assistance, *see Commonwealth v. Basemore,* 560 Pa. 258, 277 n. 10, 744 A.2d 717, 728 n. 10 (2000) (citing *Commonwealth v. Copenhefer,* 553 Pa. 285, 301, 719 A.2d 242, 250 (1998)), and, if the petitioner fails to satisfy any prong of the ineffectiveness inquiry, his claim will be rejected. *See Commonwealth v. Malloy,* 579 Pa. 425, 448, 856 A.2d 767, 781 (2004) (citing *Pierce,* 567 Pa. at 217, 786 A.2d at 221–22).

In addition, on the broader point of eligibility for relief, Appellee is required to establish that his claims have not been previously litigated or waived. *See* 42 Pa.C.S. § 9543(a)(3). In the latter regard, although direct appeal in this case predated *Commonwealth v. Grant,* 572 Pa. 48, 67, 813 A.2d 726, 738 (2002) (implementing a general rule of deferral of ineffectiveness claims to post-conviction review), since Appellee was represented by the same counsel at trial and on direct appeal, his claims of ineffective assistance of trial counsel are not waived merely by virtue of their being raised for the first time in the PCRA petition. *See Commonwealth v. Williams,* 566 Pa. 553, 782 A.2d 517, 523 (2001) (explaining in the context of a pre-*Grant* case that, where there is an intervening substitution of counsel after trial, the post-conviction setting may be regarded as the petitioner's first opportunity to raise claims of deficient stewardship on the part of his trial counsel).

## I. The Commonwealth's Appeal

The Commonwealth opens its present argument by highlighting the presumption that counsel are effective, the burden

on a post-conviction petitioner to prove otherwise, and the obligation of a defendant to participate in the defense, *see Commonwealth v. Fears,* 575 Pa. 281, 316, 836 A.2d 52, 72 (2003) (explaining that "reasonableness in this context [of a penalty-phase investigation] depends, in critical part, upon the information supplied by the defendant" (citation omitted)). The Commonwealth observes that, in a substantial number of cases, this Court has rejected ineffectiveness claims pertaining to the failure to present mental-health mitigation. *See* Brief for Appellant at 12–13 (citing, *inter alia, Commonwealth v. Williams,* 577 Pa. 473, 486–87, 846 A.2d 105, 114 (2004), and *Commonwealth v. Busanet,* 572 Pa. 535, 554–57, 817 A.2d 1060, 1072 (2002)). Further, it extensively criticizes the PCRA court for its reliance upon a 1992 Department of Corrections report as containing "red flags" concerning potential mental health issues, since there is no evidence that Appellee revealed to trial counsel that he participated in a mental health evaluation while incarcerated. The Commonwealth also develops that trial counsel did subpoena and receive records from the Department of Corrections and argues that counsel should not be faulted where the report was not supplied by the agency in response to the subpoena. According to the Commonwealth, the report also does not readily reveal that further testing would be implicated, since it indicates that Appellee was "devoid of gross psychopathology." The Commonwealth also asserts that Appellee's own expert testified that only a neuropsychologist would have apprehended that the results of this report suggested further testing.

The Commonwealth further contends that Appellee did not prove that trial counsel was ineffective for failing to present other mitigating evidence, including life-history mitigation. Although the Commonwealth recognizes Appellee's portrayal of his background as entailing substantial neglect, it highlights that his mother testified in the penalty phase that Appellee was a normal, helpful child, who worked steadily and avoided trouble. The Commonwealth indicates that Appellee failed to provide any names of potential witnesses to trial counsel and

discouraged further investigation into his background by indicating to trial counsel that he had been a troublemaker, which counsel confirmed through other sources. Considering the brutal testimony heard by the jury concerning Appellee's present and other crimes,[5] it is the Commonwealth's position that it is unlikely that the outcome of the penalty hearing would have differed had trial counsel presented the evidence developed on post-conviction review.

Appellee, on the other hand, argues that the PCRA court's determination that trial counsel rendered ineffective assistance in failing to investigate and present mitigating evidence is overwhelmingly supported by the record. Referencing *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and *Malloy,* 579 Pa. at 425, 856 A.2d at 767, Appellee stresses counsel's obligation to thoroughly investigate a defendant's background and discover all reasonably available mitigation. *See Williams,* 529 U.S. at 396, 120 S.Ct. at 1514–15; *Malloy,* 579 Pa. at 458, 856 A.2d at 787. In response to the Commonwealth's recitation of Pennsylvania cases rejecting claims of ineffective assistance in the failure to investigate and present mental-health mitigation, Appellee provides his own summary of cases in which this Court reached the opposite conclusion. *See* Initial Brief for Appellee at 21 (citing, *inter alia, Commonwealth v. Gorby,* 589 Pa. 364, 390–92, 909 A.2d 775, 790–91 (2006); *Malloy,* 579 Pa. at 459–61, 856 A.2d at 787–88; *Commonwealth v. Smith,* 544 Pa. 219, 245–46, 675 A.2d 1221, 1234 (1996)).

Appellee asserts that uncontradicted, record evidence demonstrates that, upon his entry into the case a relatively short period before trial, counsel conducted a truncated mitigation investigation, and as a result, he presented a paltry case for life. According to Appellee, even the limited information that counsel elicited, including Appellee's failure to advance in three grades, contained obvious indicators of potential cogni-

5. The victim in the Schuylkill County third-degree murder case died from a shotgun blast to the face. *See* N.T., January 22, 1999, at 572.

tive or mental-health issues that should have been reviewed by a mental-health professional.

With regard to the 1992 Department of Corrections psychological report referenced by the PCRA court, Appellee highlights various statements reflecting Appellee's impaired educational background and abilities; his affect including a fear of losing control over his impulses; and his amenability to benefitting from counseling. Appellee stresses the PCRA court's conclusion that the report was replete with "'red flags' of brain damage that indicated the need for neurop[sy]chological evaluations." *Sattazahn*, No. 2194–89, *slip op.* at 45; *accord* N.T., January 20, 2005, at 185 (testimony of a clinical psychologist confirming that "there were a lot of red flags of brain damage in this case"). Appellee acknowledges the Commonwealth's position that the record was not provided in response to a subpoena secured by trial counsel; however, he observes that it was otherwise available in court records from the Schuylkill County third-degree murder conviction, which the Commonwealth used to support an aggravating circumstance. *See generally Rompilla v. Beard*, 545 U.S. 374, 389–90, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005) (holding that where the prosecution gives notice that it will rely in aggravation on facts relating to a prior conviction, capital defense counsel has an obligation to make a reasonable effort to review the court file pertaining to that conviction).[6] Moreover, Appellee emphasizes that the PCRA court's finding of "red flags" transcended the Department of Corrections report, and included direct and available evidence of Appellee's failure to advance in kindergarten, second, and seventh grades; dropping out of school after completing only the eighth grade; his obvious attention deficits; head injuries; odd behavior, including risk-taking; social isolation and parental neglect; and other behav-

6. The Commonwealth asserts that the report was not in the file for the third-degree murder offense. However, the copy of the document produced in the PCRA hearings bears an August 17, 1992, date stamp from the Schuylkill County Clerk of Courts. *See* N.T., January 20, 2005, at 47–48 & D–15. Appellee also submitted to the court a certified copy of the entire file for the third-degree murder case containing a copy of the report, which was admitted into evidence without objection by the Commonwealth. *See* N.T., February 16, 2005, at 73 & D–62.

ioral manifestations of symptoms of mental health disorders (such as attention deficit disorder, hyperactivity disorder, pervasive developmental disorder, and learning disorder) having organic components. Appellee also references unchallenged post-conviction testimony from a psychiatrist that simply obtaining a mental-health evaluation of Appellee would have been sufficient to disclose indicia of brain damage requiring neuropsychological evaluation. *See, e.g.,* N.T., January 21, 2005, at 258, 261.[7]

Appellee contrasts the evidence advanced at the post-conviction hearings with the defense penalty-phase evidence, adduced by trial counsel from only two character witnesses and encompassing only eight pages of the transcript. Appellee notes that the first defense witness was a prior employer who had no contact with Appellee for twelve years, and the other was Appellee's mother, who furnished an exceptionally modest amount of information concerning Appellee's life history and character. *Cf. Commonwealth v. O'Donnell,* 559 Pa. 320, 347 n. 13, 740 A.2d 198, 214 n. 13 (1999) ("[I]t is difficult to disagree with [the appellant] that a defense which amasses only four pages of transcript simply does not reflect adequate preparation or development of mitigating evidence by counsel representing a capital defendant in a penalty phase hearing."). Appellee maintains that the PCRA court's findings that counsel performed deficiently in "presenting only eight pages of direct testimony in [Appellee's] case for life" and "did not conduct a thorough investigation of his client's background to determine if more statutory mitigators existed," *Sattazahn,*

---

7. Appellee also refutes the Commonwealth's contention that a defense expert had confirmed that only a neuropsychologist would have appreciated the significance of the Department of Corrections report as an indicator of the need for further mental-health investigation. He develops that, in the portion of the clinical psychologist's testimony on which the Commonwealth relies, the expert in fact references the report as evidence that a psychologist who did not have neuropsychological training would have had evidence of a number of the psychological diagnoses even without neuropsychological testing, and that with the other available background information, the usefulness of further examination would have been "hard to miss." N.T., January 21, 2005, at 211–12.

No. 2194–89, *slip op.* at 44–45, are supported by the record and free from error.

As Appellee develops, it is well settled that capital counsel has the obligation to conduct a thorough investigation for mitigating evidence, or to make reasonable decisions that render particular investigations unnecessary. *See Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. Strategic choices made following less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitation of the investigation. *See id.* at 690–91, 104 S.Ct. at 2066. In undertaking the necessary assessment, reviewing courts are to take all reasonable efforts to avoid the distorting effects of hindsight. *See Commonwealth v. Basemore,* 560 Pa. 258, 289, 744 A.2d 717, 735 (2000). Nevertheless, courts must also avoid "*post hoc* rationalization of counsel's conduct." *Wiggins,* 539 U.S. at 526–27, 123 S.Ct. at 2538.

Here, the credited evidence supports the conclusion that a deficient pre-trial investigation was undertaken. For example, under the principles applied in *Rompilla,* 545 U.S. at 374, 125 S.Ct. at 2456, counsel should have reviewed the file from the Schuylkill County third-degree murder case, including the Department of Corrections report which the PCRA court, as a factual matter supported by expert testimony of record, found contained red flags concerning potential mental-health and/or cognitive impairment. *See Rompilla,* 545 U.S. at 389, 125 S.Ct. at 2467. As another example, the evidence supports the conclusion that the failure to pass several grades during early childhood development, and the subsequent placement in a special class, strongly suggests potential mental, cognitive, emotional, and/or social difficulties which would bear investigation in defending against the imposition of the death penalty. *See* N.T., January 21, 2005, at 185 (reflecting the clinical psychologist's testimony that such circumstance "absolutely suggests problems").

The PCRA court's conclusion that no reasonable strategy justified the limited investigation is also supported by the record. As discussed above, counsel's investigation

touched upon only a limited set of sources and yielded a highly truncated mitigation presentation.[8] The difference in the nature and quality of the evidence adduced at trial versus that put forward at the post-conviction stage after a fuller investigation is substantial. *See generally Commonwealth v. Perry,* 537 Pa. 385, 392, 644 A.2d 705, 709 (1994) ("[I]t is not possible to provide a reasonable justification for appearing in front of a death penalty jury without thorough preparation.").

Finally, in terms of prejudice, we recognize that the substantial aggravation advanced by the Commonwealth encompassed Appellee's commission of the present killing in the perpetration of a robbery, as well as his history of violent offenses including two murders. Nevertheless, the presentation at trial of the credited post-conviction evidence would have provided support for the finding of several statutory mitigators, which also bore upon the degree of Appellee's culpability in terms of selecting between capital punishment and a life sentence.[9] *See Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989) (explaining that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no

8. Of the two witnesses presented, in substance, Appellee's former employer merely testified to his recollection that Appellee was faithful to his job during the two years of the employment. *See* N.T., January 22, 1999, at 593–94. On direct examination, Appellee's mother testified that Appellee was her only child and was a good child who did not get into a lot of trouble, advanced to the ninth grade, worked at several jobs, and treated her and her husband well. She also related that her husband traveled during Appellee's upbringing and had had a heart attack. Finally, at trial counsel's instance, she asked the jury to spare Appellee's life. *See id.* at 597–601.

9. As previously noted, these include the Section 9711(e)(2) mitigator, *see* 42 Pa.C.S. § 9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance."), and the mitigating circumstance under Section 9711(e)(3) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.").

such excuse" (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring))). The absence, due to an inadequate investigation, of substantial, relevant, mitigating evidence diminishes confidence in the outcome of the sentencing proceeding, particularly given the appropriate single-juror frame of reference. *See Wiggins,* 539 U.S. at 537, 123 S.Ct. at 2543 (articulating the prevailing standard for assessing prejudice from deficient stewardship in the presentation of mitigation evidence in terms of whether "there is a reasonable probability that at least one juror would have struck a different balance"). In terms of the degree of impact, we decline to disturb the judgment of the PCRA judge, who was also the trial judge, and therefore, maintains the closest point of vantage.[10]

For the above reasons, the award of a new penalty hearing will be sustained.[11]

10. In *Commonwealth v. Rios,* 591 Pa. 583, 920 A.2d 790 (2007), a majority of the Court adopted a de novo review standard for the mixed question of law and fact concerning whether capital counsel's performance fell beneath the constitutionally floor. *See id.* at 619–20, 920 A.2d at 810. This position derived from former Chief Justice Cappy's concurring opinion in *Commonwealth v. Gorby,* 589 Pa. 364, 909 A.2d 775 (2006), in which he elaborated that "this is no way alters the principle that 'the trial court is in the best position to review claims related to trial counsel's error in the first instance as that is the court that observed firsthand counsel's allegedly deficient performance.'" *Id.* at 395, 909 A.2d at 794 (quoting *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726, 737 (2002)). Indeed, the former Chief Justice stressed that he "would continue to accept the factual findings and credibility determinations of the PCRA court that are supported by the record." *Id.*

11. This case is distinguishable from *Commonwealth v. Gibson,* 597 Pa. 402, 951 A.2d 1110 (2008), in which we remanded for further proceedings concerning the prejudice inquiry, *inter alia,* because the present PCRA court made its findings and conclusions upon a full record.

Appellee raises many additional claims pertaining to sentencing, which, in light of the award of a new penalty hearing, presently will be regarded as moot. The exceptions are a claim that prior counsel was ineffective in advising Appellee that he would not be exposed to capital sentencing on retrial (to which Appellee has attached a specific request for a distinct form of relief in the form of re-imposition of a life sentence), and claims seeking reinstatement of direct-appeal rights. These are addressed below, in connection with the treatment of Appellee's appeals.

## II. Appellee's Appeals

### A. Alleged Suppression of Evidence, Failure to Correct False Testimony, and Discovery Violations

#### 1. Asserted Discovery, *Brady* Violations and Failure to Correct Pertaining to the Notes of the Hammer Interview

▮▮▮▮▮▮ Appellee first argues that the prosecutor's notes concerning his March 1991 interview with Hammer should have been provided to the defense under the Pennsylvania Rule of Criminal Procedure 573(B)(2)(a)(ii), as substantially verbatim statements of an eyewitness. Moreover, Appellee argues that the notes were subject to mandatory disclosure, because they were exculpatory in that they could be used to impeach Wanner. *See* Pa.R.Crim.P. 573(B)(1)(a) (implementing a policy of mandatory disclosure for "[a]ny evidence favorable to the accused that is material either to guilt or to punishment, and is within the possession or control of the attorney for the Commonwealth"). Appellee stresses Wanner's critical role at trial, as he was the only witness to provide evidence corroborating Hammer's version that it was Appellee, and not Hammer, who actually shot the victim. Appellee also highlights testimony by trial counsel indicating that he would have made use of the notes if he had had them. *See* N.T., July 13, 2005, at 68, 69–70. Appellee invokes the due process clause of the Fourteenth Amendment to the United States Constitution, which requires the prosecution to disclose exculpatory evidence to the defense. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963); [12] *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). In terms of prejudice, Appellee references *Commonwealth v. Grayson,* 466 Pa. 427, 353 A.2d 428 (1976), in which this Court explained:

**12.** To prevail on a *Brady* claim, the proponent must demonstrate that the evidence was favorable to him, because it is exculpatory or impeaches; the evidence was suppressed by the prosecution; and prejudice ensued. *Commonwealth v. Burke,* 566 Pa. 402, 411, 781 A.2d 1136, 1141 (2001).

"The question of credibility sometimes depends on the slightest inclinations of scale. Where the jury is in doubt as to whether or not to believe a witness, the smallest feather of a palpable exaggeration or an inconsistency in a witness's statement on a minor point may be the very item to tip the scales and discredit the witness on his main testimony." *Id.* at 429, 353 A.2d at 430 (quoting *Commonwealth v. Smith,* 417 Pa. 321, 334, 208 A.2d 219, 226 (1965)).

Appellee presents a colorable argument that the prosecutor's notes contained potential *Brady* material of the impeachment variety. However, according to uncontradicted trial and post-conviction testimony, Appellee was a participant in the conversation which the notes concerned. Therefore, the presence or absence of Wanner and/or Rizzo and the content of Appellee's own statements should have been known to Appellee, to the same degree as it was known to Hammer. To the extent that Wanner may have misrepresented aspects of the conversation or the associated circumstances, Appellee should have understood that Hammer could potentially confirm the misrepresentations. Indeed, in other passages of his brief, Appellee complains, at length, that his counsel was remiss in failing to interview Hammer before trial. *See, e.g.,* Initial Brief for Appellee at 37, 41.

 No *Brady* violation occurs where the defendant knew or could have uncovered the relevant evidence with reasonable diligence. *See Commonwealth v. Morris,* 573 Pa. 157, 178, 822 A.2d 684, 696 (2003); *Commonwealth v. Johnson,* 580 Pa. 594, 599, 863 A.2d 423, 426 (2004). Moreover, it is the petitioner's burden, on post-conviction review, to establish a constitutional infraction, such as a *Brady* violation. *See Commonwealth v. Copenhefer,* 553 Pa. 285, 321, 719 A.2d 242, 260 (1998).

 Here, Appellee has failed to establish a lack of relevant knowledge on his part and/or an inability to obtain such knowledge upon reasonable diligence.[13] Thus, he has not met

13. Certainly, a post-conviction petitioner is not obligated to testify in support of his claims for relief. It remains the petitioner's burden,

his burden of proof concerning this asserted *Brady* violation, and the only potentially extant claim is that of deficient stewardship on the part of his counsel, addressed below.

### 2. Alleged Suppression and Failure to Correct False Testimony—Incentive to Wanner

Relying upon the evidence that the prosecutor told Wanner that he would "see what he could do" concerning the outcome of sentencing in a prosecution against him, Appellee maintains that the Commonwealth committed another *Brady* violation by suppressing evidence which would have undermined Wanner's credibility as a key prosecution witness. Appellee also claims that the Commonwealth exacerbated the violation by failing to correct Wanner's false trial testimony that no promises were made to him. *See generally Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) (reaffirming that the government has an obligation to redress the elicitation of testimony which the prosecutor knows to be false).

The United States Supreme Court has not provided definitive guidance concerning what constitutes a "promise, reward or inducement" for purposes of *Brady/Giglio*. *See McCleskey v. Kemp*, 753 F.2d 877, 884 (11th Cir.1985). In collecting relevant decisions of other federal and state courts, one commentator notes an apparent split, as some courts have interpreted *Giglio* narrowly to encompass only express agreements, whereas others have applied a broader interpretation encompassing any communication suggesting preferential treatment in return for testimony. *See* R. Michael Cassidy, *"Soft Words of Hope:" Giglio, Accomplice Witnesses, and the Problem of Implied Inducements*, 98 Nw. U.L.Rev. 1129, 1152–56 (2004) (citing cases). While the Superior Court has taken the narrower approach, *see Commonwealth v. Burkhardt*, 833 A.2d 233, 243 (Pa.Super.2003), it has been argued

however, to introduce such evidence as may be necessary to support his claims for relief. Thus, to the degree that the petitioner's testimony may be the only evidence of a particular fact, as a practical matter, it may be necessary for him to testify to advance his cause.

that *Giglio* supports the broader one in which "the relevant inquiry is whether the government has said or done anything that might reasonably lead the informant to believe that his interests are aligned with that of the state." *"Soft Words of Hope"*, 98 Nw. U.L.Rev. at 1157; *see also id.* at 1156.

We need not address this controversy here, however, since the PCRA court determined that Appellee failed to satisfy his burden of establishing that any form of promise or inducement existed in the first instance. *See Sattazahn*, No. 2194–89, *slip op.* at 24–25. While the court recognized that the district attorney's office may have maintained some general policy, it explained that the statements made on the record by Commonwealth agents

> do not specifically discuss whether that policy was employed in Fritz Wanner's case following his testimony against [Appellee]. Furthermore, the Assistant District Attorney handling Fritz Wanner's case had no knowledge of any alleged agreement. The Commonwealth cannot be found to have failed to disclose an agreement which has not been proven to exist or for failing to correct testimony which has not been proven to be false.

*Id.* Thus, it is reasonably clear that the court rejected Wanner's post-conviction testimony.[14]

Wanner's post-conviction testimony was in conflict with his trial testimony, exemplifying that there were reasonable

---

14. Appellee asserts, to the contrary, that the PCRA court actually accepted Wanner's post-conviction testimony, since the court recited the representation by the prosecutor in Wanner's case concerning the general policy of the district attorney's office. *See* Initial Brief for Appellee at 31 (citing *Sattazahn*, No. 2194–89, *slip op.* at 24–25). While it is not entirely clear from the opinion, however, this reference appears to be in the context of an alternate analysis that the asserted representation, even if it applied to Wanner's case, did not rise to the level of a "promise, reward, or inducement" for purposes of *Giglio. Accord Sattazahn*, No. 2194–89, *slip op.* at 25 (prefacing a second alternative disposition regarding materiality as follows: "Furthermore, even if we would have found that an agreement existed ..."). We do not read these additional and alternative dispositions as undercutting the PCRA court's central finding, based upon its evaluation concerning the post-conviction evidence including witness credibility, that Appellee failed to establish that a promise, reward, or inducement actually existed.

grounds to question its credibility. Since the PCRA court's factual determination carries sufficient support in the evidence and is free from legal error, the present claim does not give rise to a basis for relief.

### 3. Claimed Violation of Discovery Agreement

Appellee next claims that the district attorney violated his discovery obligation after telling trial counsel he "would get everything." [15] *See* N.T., December 29, 1998, at 2; N.T., October 25, 2004, at 153–154. Appellee complains that, despite this agreement, the prosecutor failed to provide trial counsel with: transcripts and court documents showing that, in Lebanon County, Hammer had his sentence modified from 19 to 45 years to 12 to 32 years; a Court Order from Schuylkill County ordering Hammer to cooperate with the Commonwealth "with any cases against [Appellee]"; a plea agreement that Hammer entered into with the Commonwealth which deleted some of the crimes to which Hammer had originally said he would plead guilty; a preliminary hearing transcript in Schuylkill County in which Hammer testified that, when he gave a statement to the state police in July 1989, they told him they would do whatever they could do to help him; Hammer's trial testimony in Schuylkill County in which he stated that, in exchange for his statement, a state trooper promised Hammer he would talk to the district attorneys and "do the best he could" for Hammer; and information that, in the course of negotiating a plea agreement in return for testifying against Appellee, Hammer, through his attorney, told a Berks County Assistant District Attorney that he wanted to serve no jail time. Appellee asserts that he was

**15.** Such asserted promise was in response to defense requests for: evidence favorable to Appellee as to guilt or punishment; written, recorded, and/or substantially verbatim oral statements of eyewitnesses, co-defendants, co-conspirators, and accomplices: information about the terms of the plea agreement with Hammer; the complete record of all plea agreements entered into with Hammer in Berks, Schuylkill, Northumberland, and Lebanon Counties; and information in the possession of police and/or investigative agencies regarding any statements, letters, or promises given to Hammer. *See* Nov. 6, 1998 Request for Discovery; Dec. 15, 1998, Omnibus Pretrial Motion.

prejudiced by the Commonwealth's failure in this regard, as he was denied substantial impeachment material, which would have afforded the jurors a fuller understanding of Hammer's incentive to testify for the prosecution, thus undermining his accusations.

The Commonwealth, on the other hand, relies on the public character of the documents and transcripts in issue and notes that the out-of-county documents were not within the possession of the Berks County prosecutor. *See* Brief for Appellant at 25 ("According to the plain language of [Rule of Criminal Procedure 573], there is simply no authority to indicate that Berks County was responsible for gathering information from other counties and providing that information to [Appellee]."). The Commonwealth also notes that Appellee's challenge was raised in his appeals from his robbery and burglary convictions and was recently decided by the Superior Court in the Commonwealth's favor. *See Commonwealth v. Sattazahn*, 869 A.2d 529, 534 (Pa.Super.2005) (explaining that "there is no *Brady* violation where the parties had equal access to information or if the [a]ppellant knew of or could have uncovered the evidence with reasonable diligence." (citing *Grant*, 572 Pa. at 55, 813 A.2d at 730)). As to information within the Berks County prosecutor's immediate possession and control, the Commonwealth refutes Appellee's claim of materiality. With regard to previous drafts of the memorandum of cooperation and plea agreement with Hammer, the Commonwealth explains that changes were not made to afford Hammer a more favorable bargain, since the penalties concerning deleted charges were to run concurrently with other charges to which Hammer pleaded, and thus, the actual sentence was unaffected. The Commonwealth further notes that trial counsel conceded that he would not have altered his cross-examination of Hammer based upon this modified agreement. *See* N.T., January 20, 2005, at 63. Similarly, the Commonwealth contends that Appellee cannot demonstrate that the outcome of trial would have been different if he had been aware that Hammer told the Commonwealth that he did not want to be incarcerated. According to the Common-

wealth, Hammer's personal wishes, however unreasonable, were not relevant, particularly since he already had entered his plea after the first trial. *See* N.T., January 15, 1999, at 265. Moreover, because Hammer did not receive what he was seeking, the Commonwealth contends that the impeachment value of this information is questionable.

We agree with the Commonwealth's arguments concerning this claim. Notably, many of the out-of-county documents do not fall within the four corners of Appellee's document requests, other than via the catch-all provision requesting all potentially exculpatory evidence. We do not regard the acquiescence of a county district attorney to such a request as creating an obligation to assemble all potentially relevant records and transcripts from other criminal proceedings in other counties for the benefit of the defense. With regard to the information within the Berks County prosecutor's possession and control, our own assessment concerning materiality/prejudice is in line with that of the Commonwealth.

### 4. Entitlement to discovery

Appellee develops that, before the PCRA court directed the Commonwealth to furnish a copy of the notes from prosecutor's pre-trial interview with Hammer, the Commonwealth provided the court with twenty-nine pages of documents for *in camera* review. *See* N.T., February 16, 2005, at 10–12. He argues that the PCRA court erred by failing to require production of twenty-eight of these pages. Appellee explains that the Commonwealth has indicated that at least five pages concerned meetings about plea negotiations with Hammer's counsel, the state police, and other members of the district attorney's office. Since the notes describe plea agreement discussions with others, Appellee asserts, they are not work product. Moreover, he contends, even prosecutorial work-product is discoverable when the mental impressions of the prosecutor themselves disclose or embody a constitutional violation.

██ Under Rule of Criminal Procedure 902(E)(2), no discovery is permitted at any stage of the post-conviction proceedings on a first, counseled petition in a capital case, except upon leave of court after a showing of good cause. Pa. R.Crim.P. 902(E)(2). Appellate courts review the denial of discovery by a PCRA court for abuse of discretion. *See Commonwealth v. Bryant*, 579 Pa. 119, 159, 855 A.2d 726, 749–50 (2004). Here, Appellee presents no evidence that the PCRA court's *in camera* screening was erroneous, and, accordingly, we decline to disturb its discretionary determination. *See generally id.* at 159–60, 855 A.2d at 750–51 (explaining that a showing of good cause under Rule 902(E)(2) requires more than just a generic demand for potentially exculpatory evidence that might be discovered if the petitioner is permitted to review requested materials).

## B. Alleged Deficient Stewardship of Trial Counsel in the Investigation and Cross–Examination of Commonwealth Witnesses

### 1. Lies by Hammer

██ Appellee next argues that his trial counsel was ineffective for failing to demonstrate to the jury that Hammer lied in pre-trial statements and testimony at Appellee's trial. While this claim is stated very generally, the development in Appellee's brief is centered upon a July 1989 polygraph examination conducted by state police, in which Hammer initially denied having been physically present when the victim was shot or having knowledge concerning the details of the events giving rise to the killing. Further, Appellee contends that his trial counsel was derelict in his failure to interview Hammer, which Appellee asserts would have revealed additional inconsistencies and yielded avenues for the impeachment of other witnesses. Appellee stresses that, at the post-conviction hearing, trial counsel could identify no strategic reason for failing to cross-examine Hammer with the inconsistent statements given to state troopers. *See* N.T., November 22, 2004, at 216. According to Appellee, if the jurors had heard these lies about the events which formed the foundation of the Common-

wealth's case, they would have had an insight into the self-interested motivation for his trial testimony. *See Berryman v. Morton,* 100 F.3d 1089, 1098–99 (3d Cir.1996) (holding that counsel was ineffective for, *inter alia,* failing to impeach a witness with prior inconsistent statements). While Appellee recognizes that trial counsel elicited an admission from Hammer that he had lied in connection with another prosecution, he contends that there is a critical distinction between such falsehood and those involving material facts underlying the present case.

Appellee fails, however, to address material aspects of counsel's post-conviction testimony. Counsel testified that he was reticent to raise the substance of Hammer's interview with state police, because he was concerned that Hammer's failure of the polygraph relative to a different version of the events would lend credence to Hammer's trial version of the events. *See, e.g.,* N.T., November 22, 2004, at 219. In failing to acknowledge counsel's stated concerns, Appellee's present argument does nothing to discount it. Thus, he has failed to meet his burden on post-conviction review of establishing that counsel lacked a reasonable basis supporting his actions.

### 2. Failure to cross-examine Hammer concerning polygraph examination

Appellee also argues that trial counsel unreasonably failed to cross-examine Hammer by questioning him concerning his failure of the initial polygraph examination and his refusal to submit to a further examination after having given a statement implicating Appellee. Appellee invokes the legal principle that a witness may be cross-examined as to any matter tending to show the interest or bias of that witness. *See Commonwealth v. Nolen,* 535 Pa. 77, 83, 634 A.2d 192, 195 (1993). He develops that state police found Hammer to be *"DECEPTIVE"* when he denied having shot or helped to shoot Mr. Boyer, and denied having been physically present during the robbery/killing.[16] According to Appellee, the infor-

---

**16.** The state police report concerning the polygraph examination indicates:

mation need not have been introduced for its truth, but rather, could have been offered to demonstrate the extent of Hammer's incentive to curry favor with the authorities. Appellee observes that, at the PCRA hearing, trial counsel admitted, "[i]f I could have got the fact that he took a lie detector test and the results of those lie detector tests into evidence, of course I would have done that." N.T., November 22, 2004, at 236.

In *United States v. Scheffer*, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), the United States Supreme Court upheld a *per se* ban on the admission of polygraph results in court martial proceedings based upon their inherent unreliability. *See id.* at 310–12, 118 S.Ct. at 1265–66. *Scheffer* has been applied more broadly to support the exclusion of polygraph evidence, even in the capital context. *See, e.g., United States v. Fulks*, 454 F.3d 410, 434 (4th Cir.2006) (" '*Scheffer*, with its emphasis on the unreliability of polygraph evidence and the interest of courts in excluding such unreliable evidence, certainly suggests that exclusion of polygraph results would pass constitutional muster in th[e capital] context, as well.' " (citation omitted)). Particularly in light of the federal authority, Appellee has provided no basis to undermine this Court's holdings precluding the admission of polygraph evidence. *See, e.g., Brockington*, 500 Pa. at 220, 455 A.2d at 629.

### 3. Failure to interview Hammer and impeach Wanner

Appellee next complains that, despite the key role Hammer played in the prosecution, trial counsel failed to even interview him. Appellee emphasizes that Hammer and Russo were the only witnesses who could expose asserted fabrications by Wanner concerning the overheard conversation between Hammer and Appellee. Appellee acknowledges that counsel tried to locate Russo but faults counsel for failing to

> The opinions concerning the polygraph charts of this Examinee were made known to the Examinee and he was afforded an opportunity to explain his physiological reactions to the Relevant Crime Questions. The Examinee was unable to do so. Shortly, thereafter, the Examinee admitted his participation in this crime.

N.T., November 22, 2004, Ex. D–25, at 6.

even consider the potential that Hammer might impeach Wanner's testimony. According to Appellee, had counsel made the modest effort of interviewing Hammer, he could have learned that Wanner invented the account that Appellee claimed to have taken the gun from Hammer in order to shoot Boyer; and Wanner lied concerning who was present when he purportedly overheard the conversation. In light of counsel's asserted dereliction, Appellee contends, Wanner's testimony went virtually unchallenged.

Appellee also challenges the PCRA court's characterization of Wanner's testimony as reflecting only a "collateral conversation," *Sattazahn*, No. 2194–89, *slip op.* at 26. In this regard, Appellee develops that Wanner was the only person other than Hammer (who, as an accomplice to the robbery, was a corrupt and polluted source) to provide evidence supporting the Commonwealth's critical contention that Appellee shot the victim. Indeed, Appellee highlights, the district attorney specifically relied on Wanner's testimony in closing to gain a first-degree murder conviction. *See* N.T., January 21, 1999, at 489–90.

The Commonwealth responds with the observation that Appellee, as an actual (or at least asserted) participant in the overheard conversation with Hammer, could have provided the same information Appellee now asserts Hammer would have disclosed in any interview concerning the truth or falsity of Wanner's testimony.

The Commonwealth's argument carries controlling force in the absence of any contrary evidence, and Appellee's failure to answer it undermines his claim for relief. *See supra* note 13.

### 4. Reliance on discovery from the prosecutor

Appellee's next assertion of deficient stewardship on the part of his trial counsel centers on counsel's reliance on the prosecutor's discovery responses in lieu of an independent investigation. *See Commonwealth v. Mabie*, 467 Pa. 464, 474, 359 A.2d 369, 374 (1976) (explaining that reliance on "the prosecution's file is not a substitute for an independent investi-

gation by defense counsel"); *cf. Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 2588, 91 L.Ed.2d 305 (1986). According to Appellee, he was prejudiced, because he was denied the use of valuable impeachment evidence against Hammer, *see supra* note 4 (cataloguing the asserted evidence), and there is a reasonable probability that the outcome of the trial would have been different. Appellee also criticizes the PCRA court to the degree that it relied upon counsel's entry into the case shortly before trial, *see Sattazahn,* No. 2194–89, *slip op.* at 31, particularly since the record reflects that counsel did not seek a continuance to prepare properly for trial. According to Appellee, the PCRA court has not directly refuted that a better-informed cross-examination and defense would have resulted if counsel had gathered the available information to impeach Hammer and Wanner.

In response, the Commonwealth acknowledges, at least arguably, that trial counsel could have obtained the noted documents and information prior to trial. It contends, however, that the information would have done nothing more than to further impeach Hammer, whose credibility was drawn into question from the beginning. The Commonwealth observes that, on Hammer's cross-examination, trial counsel adduced the witness's guilty pleas to several other burglaries and robberies, in addition to his participation in the present offenses, and engaged in extensive questioning concerning the benefits he received in exchange for his testimony against Appellee. The Commonwealth also references trial counsel's post-conviction testimony that he was careful not to cross-examine Hammer too closely regarding his convictions in Lebanon and Schuylkill Counties, as to do so may have risked the exposure of Appellee's identity as Hammer's coconspirator in those crimes as well. Thus, it may have opened the door to the introduction of otherwise inadmissible inculpatory evidence. Accordingly, the Commonwealth characterizes the information Appellee argues should have been admitted as merely corroborative and cumulative of other evidence.

On this claim, we find colorable merit to Appellee's claims regarding the arguable merit and reasonable strategy prongs

of the ineffectiveness inquiry. Additionally, we find the PCRA court's stated reasoning concerning this claim to be somewhat underdeveloped. *See Sattazahn,* No. 2194–89, *slip op.* at 17 ("Jeffrey Hammer was subject to cross-examination and impeachment on several issues and it is unlikely that any additional impeachment evidence that was allegedly withheld by the Commonwealth would have changed the outcome of trial."). Nevertheless, we note that trial counsel established powerful motivation on the part of Hammer to curry favor with authorities, in the form of his exposure to capital punishment or sentences aggregating up to 240 years on a host of criminal charges, and his entry into a plea bargain centered on his cooperation in the prosecution of Appellee. *See* N.T., January 20, 1999, at 327–333. In light of the evidence and argument that was adduced, upon our independent review of the record, we differ with Appellee's assessment concerning the potential impact of the additional impeachment evidence and decline to disturb the court's holding regarding prejudice.

### 5. Failure to pursue lines of helpful cross-examination from Appellee's first trial

Appellee next asserts that trial counsel failed to pursue helpful lines of cross-examination that were applied to impeach Hammer at the first trial, including developing Hammer's: denial that the .22 caliber pistol used to kill the victim had been purchased from him; initial uncertainty about the caliber of the larger weapon; knowledge concerning how many shells loaded into the clip of the smaller caliber pistol; and earlier-expressed anticipation of parole after nineteen years. According to Appellee, trial counsel offered no reason for not asking Hammer many of these questions at the retrial of Appellee's case. *See* N.T., November 22, 2004, at 227–29, 232. Although Appellee acknowledges the PCRA court's observation that trial counsel did ask Hammer whether he had told someone else that Appellee had bought the .22 for Hammer, which Hammer denied, he claims that this is far less than what was achieved at the first trial.

The Commonwealth's responsive argument is that Appellee has failed to establish sufficient prejudice to warrant relief.

With regard to the line of questioning concerning the handgun, Appellee's argument on this claim does not acknowledge that, on cross-examination, trial counsel established Hammer's familiarity with the .22 caliber pistol and the type of ammunition used in the robbery/killing and confirmed Hammer's presence when the pistol was purchased. *See* N.T., January 20, 1999, at 323–325.[17] Counsel further presented a witness to contradict Hammer's testimony that Appellee had not purchased a small-caliber handgun for him (Hammer). *See* N.T., January 21, 1999, at 438. In terms of Hammer's expectation concerning punishment, again, counsel aggressively pursued parallel lines of evidentiary development. As to both the circumstances under which the handgun was used and Hammer's cooperation with authorities, the evidence gave rise to counsel's arguments to the jurors, *inter alia,* as follows:

Jeffrey Hammer was responsible for the murder and you heard his testimony that he pled guilty to third degree murder.

... You heard testimony regarding the position of [sic] Jeffrey Hammer was in in 1989. He was jammed up so he found a scapegoat. My client.

\* \* \*

Now the gun. You heard a lot of testimony about this gun .22 caliber pistol, the gun. Let's assume for argument sake that [Appellee] purchased this gun. The evidence is that he did and that came from people who don't have credibility problems but the purchase of this gun is bought [sic] with evidence that it was purchased for Jeffrey Hammer. You'll

17. Indeed, in a different passage of his brief, Appellee acknowledges that the evidence pursued by counsel in this regard was considerable. *See* Initial Brief for Appellee at 51 ("Considerable evidence pointed to Hammer as the shooter. Hammer was present when the murder weapon was purchased, had fired the gun in the past, and knew where the gun was hidden before the incident. He admitted his participation in the robbery and even to firing a gun—though he claimed a different one—during the incident.").

recall that [the firearms dealer] remembered that Jeffrey Hammer was along when this gun was purchased. He didn't remember [Appellee] but he remembered Mr. Hammer and as you will recall [the dealer] told you that Mr. Hammer frequented the gun shop. Purchasing the gun proves absolutely nothing. Just one other very interesting part of Mr. Hammer's testimony. I asked Jeffrey Hammer do you know what kind of ammunition was used in the gun on April 12, 1987 in this gun, the murder weapon and he said without hesitation CCI. Eleven years later and he knows what type of ammunition was in the gun that caused the death of Richard Boyer. He was very familiar with that gun. He told you everything he could about this gun without admitting that he was the shooter....

Now, in 1989, Jeffrey Hammer was jammed up. He was facing ten burglaries, two robberies, one murder and he was also told that the Commonwealth was seeking the death penalty.... I don't think anyone could be as jammed up as Mr. Hammer was in 1989 so he did what any smart person would, he blamed someone else and he got a deal. He got a plea bargain for 19 years to 55 years in jail and he got out of the death penalty....

N.T., January 21, 1999, at 464–65. Again, in line with the Commonwealth's argument and the PCRA court's conclusion, we conclude that Appellee has failed to establish the requisite prejudice.

## C. Assertion of Improper Instructions Concerning Comparative Penalties

 Appellee next contends that he was denied due process and the effective assistance of counsel when the trial court advised the jurors, prior to their guilt-phase deliberations, concerning the specific punishments Appellee could receive for each degree of criminal homicide for which he was charged.[18] According to Appellee, the instruction infused the

18. The court instructed the jurors as follows:
Our law requires that prior to your deliberation[,] I inform you as to the penalty of murder offenses[. Y]ou are aware that the penalty for

deliberative process with extraneous and prejudicial concerns, thus creating an unacceptably high risk that the jurors would return a verdict based, not on the facts, but rather, on their visceral sense of what the appropriate punishment should be. Appellee contends that the impact the instruction had on the sentencing deliberations was just as harmful, since, having learned that a lesser offense (second-degree murder) carried a life sentence, there was an unacceptable risk that the jury would feel pressured to return a death verdict so as to reflect the greater culpability attendant to a premeditated murder. Appellee claims that trial counsel was ineffective for failing to object to the instructions or insist upon a limiting instruction that the jury was not to consider these punishments in deliberating guilt or innocence.

In support of these arguments, Appellee develops that information as to the consequences of a particular verdict is irrelevant to the jury's task of determining guilt or innocence. *See Shannon v. United States*, 512 U.S. 573, 579, 114 S.Ct. 2419, 2424, 129 L.Ed.2d 459 (1994) (explaining that providing jurors with sentencing information "invites [jurors] to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion").[19] Further, Appellee invokes his "right to a verdict based solely upon the evidence and the relevant law." *Chandler v. Florida*, 449 U.S. 560, 574, 101 S.Ct. 802, 809, 66

first-degree murder carries two possible penalties, death or life imprisonment; the penalty for second degree, life imprisonment; penalty for murder third degree, maximum sentence of not less than 20 years nor more than 40 years in an appropriate state correctional institution. In second degree murder, the Court has no discretion and must impose a sentence of life imprisonment and in third degree the Court may impose a maximum sentence or any lesser sentence which in its discretion the Court deems appropriate.
N.T., January 21, 1999, at 512. Appellee's direct claims of trial court error pertaining to this instruction, and the reasonable-doubt charge are waived, since no objections were lodged at trial. Thus, our discussion of the merits of these challenges is limited to an assessment of the arguable merit of the derivative ineffectiveness claims.

19. *Shannon* concerned a defense request for penalty information related to a verdict of not guilty only by reason of insanity. *See Shannon*, 512 U.S. at 577–78, 114 S.Ct. at 2423.

L.Ed.2d 740 (1981). Appellee distinguishes the decision in *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988), relied upon by the PCRA court and the Commonwealth, on the basis that the trial court in *Yarris* had issued a limiting instruction, *see id.* at 597, 549 A.2d at 526, whereas, none was given here. *See generally Commonwealth v. Covil*, 474 Pa. 375, 383, 378 A.2d 841, 845 (1977) (explaining that, whenever potentially prejudicial information "is admissible for a limited purpose, a defendant is entitled to a limiting instruction.").

Although Appellee is correct that a limiting instruction was issued in *Yarris*, the Court's disposition centered on the absence of prejudice. *See Yarris*, 519 Pa. at 598, 549 A.2d at 526 ("Since there is no indication that informing the jury of the various murder conviction penalties was unduly prejudicial, and because, to the contrary, knowledge of the severity of the penalties could serve only to caution a jury as to the seriousness of a conviction, the instruction was permissible."). We recognize that the logic of *Shannon* would be in tension with the application of *Yarris's* holding to a non-capital case. Invocation of *Shannon* would have been to little avail in Appellee's case, however, since the general federal rule discussed there disfavoring the dissemination of sentencing information to jurors is expressly limited to circumstances in which "a jury has no sentencing function." *Shannon*, 512 U.S. at 579, 114 S.Ct. at 2424; *see also id.* n. 4 ("noting that, particularly in capital trials, juries may be given sentencing responsibilities"). Thus the High Court implicitly recognized the realities associated with capital trials, for example, that the process of selecting jurors qualified to discharge the sentencing function will necessarily entail some frank discussion of penalty. Indeed, the specific association between the offense of first-degree murder and the availability of capital punishment was discussed with individual jurors on voir dire at Appellee's trial, *see, e.g.*, N.T., January 12, 1999, at 89, and Appellee has made no claim of trial court error or deficient stewardship associated with such discussion.

Finally, for the jurors to have acted along the lines of any of Appellee's theories, they would have been proceeding contrary

to the trial court's explicit instructions concerning the elements of the various offenses and the jurors' duty to find Appellee not guilty of each offense upon a finding that any element was not established beyond a reasonable doubt by the Commonwealth. *See, e.g.,* N.T., January 21, 1999, at 526 (reflecting the trial court's admonition that, "[i]f you do not find that the Commonwealth has proven this offense beyond a reasonable doubt, your verdict then on the first degree murder is not guilty."). Thus in addition to there being an absence of deficient stewardship, we also find a lack of material prejudice.

## D. Reasonable Doubt Instruction

Appellee next complains that the instruction provided to the jury in the guilt-phase charge in this case materially deviated from Pennsylvania's standard jury instructions and misdefined reasonable doubt in violation of the Sixth and Fourteenth Amendments and Article I, Sections 6 and 9 of the Pennsylvania Constitution. Appellee develops that, when defining "reasonable doubt," the trial court told the jury: "A reasonable doubt is a kind of doubt that *refrains* a reasonable person from acting in a matter of importance to himself or herself." N.T., January 21, 1998, at 498 (emphasis added). Appellee also suggests that trial counsel was ineffective for failing to object.

While, as Appellee develops, this Court has expressed a preference for a different formulation of reasonable doubt charge, *see Commonwealth v. Uderra,* 580 Pa. 492, 522, 862 A.2d 74, 92 (2004), it has found no basis for reversal upon the issuance of instructions similar to that issued at Appellee's trial. *See, e.g., Commonwealth v. Rios,* 591 Pa. 583, 611, 920 A.2d 790, 806 (2007); *Commonwealth v. Young,* 456 Pa. 102, 110, 317 A.2d 258, 262 (1974); *Commonwealth v. Brown,* 470 Pa. 274, 289, 368 A.2d 626, 634 (1976). The federal courts have similarly not found constitutional error upon the issuance of similar instructions.[20]

**20.** *See, e.g., Thomas v. Beard,* 388 F.Supp.2d 489, 531–33 (E.D.Pa.2005) ("Given the absence of specific, constitutionally mandated language, the

### E. Asserted Ineffectiveness in the Advice that the Commonwealth Was Foreclosed From Seeking the Death Penalty on Retrial

Appellee claims that his initial direct appeal must be voided and the life sentence imposed in his original trial restored, because that appeal was induced by his prior attorney's guarantee that "there was no way the Commonwealth could seek the death penalty if he won his appeal." N.T., January 20, 2005, at 103. According to Appellee, counsel's erroneous guarantee that Appellee could not be death eligible on retrial constituted ineffective assistance of counsel, in violation of the Sixth and Fourteenth Amendments. Further, Appellee contends that his trial counsel was ineffective for failing to raise the issue.[21]

As previously developed, the PCRA court's substantive disposition of this claim was based on the issuance, after the relevant advice was given to Appellee, of this Court's decision in *Martorano*, 535 Pa. at 178, 634 A.2d at 1063 (applying a "clean-slate" approach to capital resentencing scenarios in Pennsylvania unless a determination was rendered that the prosecution has not proved its case). Prior to *Martorano*, the court believed that counsel was justified in relying upon prior

wide latitude given to judges in crafting their instructions, and the fact that both federal and state courts have upheld charges using identical, or substantially similar, language, [the petitioner's] claim of constitutional error [in the trial court's issuance of a reasonable-doubt instruction using the term 'restrain'] is unpersuasive."); *Peterkin v. Horn*, 176 F.Supp.2d 342, 381 (E.D.Pa.2001) ("Although we would agree with [the petitioner] that the word 'restrain' implies a slightly higher level of doubt than does the word 'hesitate,' we do not find that the trial court's use of the word 'restrain' in its reasonable doubt instruction operated to raise the level of doubt so high as to constitute constitutional error. Rather, our review of the instruction as a whole reveals that the trial court adequately defined the meaning and outlined the proper implementation of the concept of reasonable doubt to the jury.").

21. This underlying claim may be waived; however, Appellee presents an extensive argument that it is not, *see* Initial Brief for Appellee at 56–58; moreover, he advances a layered ineffectiveness claim. Since we find, below, that the underlying claim otherwise does not present a basis for relief, further discussion of the waiver issue is unnecessary. *See Commonwealth v. Hughes*, 581 Pa. 274, 305–310, nn. 13 & 20, 865 A.2d 761, 779–782, nn. 13 & 20 (2004).

decisions of the United States Supreme Court such as *Bullington*, 451 U.S. at 430, 101 S.Ct. at 1852, and *Rumsey*, 467 U.S. at 203, 104 S.Ct. at 2305, which reflected exceptions to the clean-slate approach. *Sattazahn*, No. 2194–89, *slip op.* at 11–12. The difficulty with the PCRA court's analysis, however, is that there was an intervening decision, *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), reflecting a narrow reading of *Bullington* and *Rumsey* and adopting essentially the same understanding of the clean-slate approach later applied in *Martorano*. Indeed, *Poland* was referenced extensively in *Martorano*. *See Martorano*, 535 Pa. at 192–93, 634 A.2d at 1070 (explaining that, in *Poland*, "the Supreme Court reaffirmed the 'clean slate' rule ... and declined to extend *Bullington* further."). In light of *Poland's* existence in the time frame in which counsel's advice was rendered, the PCRA court's conclusion that he could reasonably have relied upon a broad reading of *Bullington* is unjustified.

Despite the difficulty with the PCRA court's legal reasoning, a primary weakness in Appellee's contention is that he makes no effort to establish, by way of creditable evidence, that he would not have lodged the appeal had his counsel given different advice. While Appellee appears to believe that it can be assumed that a defendant or post-conviction petitioner would not risk imposition of the death penalty in order to gain a chance at freedom, we do not find such assumption warranted, as it is contrary to experience.

It is a post-conviction petitioner's burden to prove all elements of his claims, including prejudice. While certainly the petitioner is not required to testify in support of his claims, again, relief may be unavailable in the absence of such evidence or some reasonable substitute.

### F. Claims of Entitlement to Restoration of Direct– Appeal Rights

■■■■ Appellee claims entitlement to restoration of his direct-appeal rights in order for this Court to conduct proportionality review and assess the record to determine whether

his sentence was the result of passion, prejudice, or any other arbitrary factor. *See* Initial Brief for Appellee at 96–99 (citing 42 Pa.C.S. § 9711(h)(3)(i)). Appellee notes that the PCRA court failed to address such claims.

In terms of proportionality review, Appellee claims a protected liberty interest in meaningful proportionality review. He explains that, from the time of his offenses until June 25, 1997, the Pennsylvania death-penalty statute required this Court to conduct a review to determine whether the sentence of death imposed in his case was "excessive or disproportionate to the penalty imposed in similar cases." 42 Pa.C.S. § 9711(h)(3)(iii) (repealed).[22] Appellee invokes *Gribble*, which determined that 1997 amendments eliminating the requirement to conduct proportionality review could not be applied to death sentences issued prior to its effective date. *See id.* at 90–91, 703 A.2d at 439–40. According to Appellee, since his capital offense and initial trial occurred prior to that date, he has a vested right to proportionality review, and this Court's failure to recognize that right on direct appeal violated the *ex post facto* prohibition against adverse retroactive criminal legislation contained in Article I, Section 10 of the United States Constitution, as well as due process requirements.

We differ with Appellee's arguments. As *Gribble* explains, former Section 9711(h)(3)(iii) applied to all death sentences issued while it was effective. *See Gribble*, 550 Pa. at 89, 703 A.2d at 439 ("*When Gribble was sentenced to death* on October 11, 1994, he became statutorily entitled to review in this Court, 42 Pa.C.S. § 9711(h)(1), which at that time gave him the legislatively created right to proportionality review[.]" (emphasis added)). The controlling fact here, however, is that Appellee did not receive a death sentence until after the repeal of the statutory prescription. Appellee does not develop a focused challenge to the understanding, reflected in *Gribble*, that the operative event which triggered the entitlement to proportionality review was the imposition of a sentence of

22. The history and nature of proportionality review are developed further in *Commonwealth v. Gribble*, 550 Pa. 62, 86–90, 703 A.2d 426, 438–39 (1997).

death.[23] In short, his argument does not give rise to a basis for relief.

Appellee's second point concerns the continuing statutory requirement that this Court affirm a death sentence unless it is determined, among other things, that "the sentence of death was the product of passion, prejudice or any other arbitrary factor." 42 Pa.C.S. § 9711(h)(3)(i). He points out, correctly, that this Court's opinion on direct appeal did not expressly address this portion of the statute. According to Appellee, this omission violated his statutory and due process rights, as well as his Eighth Amendment right to meaningful appellate review of his death sentence, and he is entitled to reinstatement of his right to a direct appeal.

It is traditional for this Court to specifically discuss the review under Section 9711(h)(3)(i) in our opinions on direct appeal, and we acknowledge that it would have been preferable for us to do so in Appellee's case. Since, however, Appellee has been awarded a new sentencing hearing, the final review in this regard as it pertains to penalty, if necessary, may be accomplished at a later stage. At this juncture, we confirm that we have now twice reviewed the full record concerning Appellee's convictions and conclude that they were not the result of passion, prejudice, or any other arbitrary factor.

### G. Cumulative Effects of Alleged Errors and Ineffectiveness

Finally, Appellee offers several permutations of arguments resting on the cumulative effects of asserted errors and ineffectiveness. To the degree that Appellee's claims failed on merit or arguable merit, there is no basis for an accumulation claim. To the extent that individual dispositions have centered

23. Parenthetically, a more developed constitutional challenge along the lines of that presented by Appellee has been rejected in the federal courts. *See Hatch v. Oklahoma,* 58 F.3d 1447, 1463–64 (10th Cir.1995) (explaining that "the [Ex Post Facto] Clause is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts,' " and is not implicated by alterations to proportionality review (citations omitted)).

on the absence of sufficient prejudice to give rise to relief on an individual basis, we are also satisfied that prejudice would be lacking on a collective basis relative to those claims as well.

The order of the PCRA court is affirmed.

Justice GREENSPAN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE, Justice BAER, Justice TODD and Justice McCAFFERY join the opinion.

Justice EAKIN files a concurring and dissenting opinion.

Justice EAKIN, Concurring and Dissenting.

I dissent from the portion of the majority's decision affirming the PCRA court's grant of a new penalty hearing based on trial counsel's ineffectiveness for failing to present mental health mitigation evidence. For the same reasons expressed in *Commonwealth v. Romero,* 595 Pa. 275, 938 A.2d 362, 387 (2007) (at time of trial, *Williams* and *Wiggins* had not been decided, and degree of investigation required for capital counsel to not be deemed ineffective had not evolved to extent currently required), I believe counsel's stewardship should be evaluated by the standards in effect at the time of trial. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective *at the time.*" *Romero,* at 387 (citations omitted); *see also Commonwealth v. Williams,* 950 A.2d 294 (Pa.2008), Concurring Op., at 324 (Eakin, J., concurring) ("Any other standard would require counsel to predict changes in the law and turn representation into prognostication....").

Although *Romero* was a plurality, my view remains "that counsel's performance regarding mitigating evidence should be critiqued according to the law existing at the time of trial, not according to later-announced standards." *Williams,* at 324 (citing *Commonwealth v. Hughes,* 581 Pa. 274, 865 A.2d 761, 825 (2004) (Castille, J., concurring and dissenting, joined

by Eakin, J.)). Here, counsel testified Appellee's mother gave no indication of appellee's psychiatric history, Appellee's prison records gave no indication of any mental illness, and Appellee failed to provide counsel with names of potential witnesses and discouraged further investigation into his background, indicating he had been a troublemaker. *Cf. Romero*, at 388 (appellant showed no signs of mental illness, never gave counsel any useful information about his childhood or family when asked, and prison records contained no indication of psychiatric problems, although counsel was aware appellant had done poorly in school and dropped out). Given these circumstances, counsel's decision not to pursue evidence of mental health mitigation was not unreasonable. *See Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 266 (2006) (in evaluating reasonableness of counsel's investigation, court must remember counsel's decisions may depend heavily on information his client provides to him). I would instead assess counsel's stewardship under the law at the time of Appellee's trial, by which standard one must conclude counsel was effective; accordingly, I would reverse the grant of a new penalty phase hearing.

In all other respects, I join the majority opinion.