J-A15044-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JACOB HARRY HESS | : | |
| | : | |
| Appellant | : | No. 1382 MDA 2023 |

Appeal from the PCRA Order Entered August 30, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0002819-2018

BEFORE:   DUBOW, J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED: JULY 12, 2024**

Appellant, Jacob Harry Hess, appeals from the August 30, 2023, order entered in the Court of Common Pleas of York County, which denied his first petition filed under the Post-Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-9545, without an evidentiary hearing.  After a careful review, we affirm.

The relevant facts and procedural history are as follows: On June 11, 2018, the Commonwealth filed an Information charging Appellant with rape of a child, sexual assault, indecent assault of a person less than thirteen years of age, and corruption of minors.[1]  On March 4, 2019, Appellant, represented by counsel, proceeded to a jury trial at which the victim, E.G.G., who was

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(c), 3124.1, 3126(a)(7), and 6301(a)(1)(ii), respectively.

thirteen years old, testified that, when she was five or six years old, her biological father, as well as her two siblings, lived with Appellant, his paramour, and his young daughter in York, Pennsylvania. N.T., 3/5/19, at 32. E.G.G. lived primarily with her biological mother during this time; however, she visited her biological father and siblings at Appellant's house on weekends. *Id.*

E.G.G. testified that, every weekend for a month, when her biological father was at work, Appellant took her into his bedroom, took off her clothes, and put his penis inside of her vagina. *Id.* at 33-35. E.G.G. indicated that "it would hurt" when Appellant's penis went inside of her vagina. *Id.* at 36. Appellant told her not to tell anyone about the incidents, and no other adults were at home when the abuse occurred. *Id.* at 37. E.G.G. testified that sometimes her siblings and Appellant's daughter, who were all young children,[2] were in the room when the sexual abuse occurred. *Id.* at 38.

At some point, E.G.G. stopped living with her biological mother, went into the foster care system, and was adopted. *Id.* When she turned eleven or twelve years old, E.G.G. told her adoptive mother about the abuse, and when her adoptive mother typed Appellant's name into Facebook, the profiles of many people with the same name appeared on the computer screen. *Id.* at 39. E.G.G. indicated she had not seen Appellant since the last time she

---

[2] E.G.G. testified that, as compared to her two siblings and Appellant's daughter, she was the second oldest. *Id.* at 33.

visited her biological father when she was five or six years old; however, as soon as E.G.G.'s adoptive mother opened Appellant's Facebook page, E.G.G. immediately recognized Appellant as the person who had sexually abused her. *Id.* She noted that she did not tell anyone about the abuse until after she was adopted because she "didn't trust anyone." *Id.* at 42.

On cross-examination, E.G.G. indicated that she was in first or second grade when Appellant sexually abused her. *Id.* at 44. E.G.G. indicated that Appellant's paramour was not in the house when Appellant sexually abused her; however, she reiterated that sometimes her siblings, as well as Appellant's daughter, were in the room when the incidents occurred. *Id.* The following exchange occurred between Appellant's trial counsel and E.G.G.:

> Q. So, while this was going on, did you have occasion to see [your brother, your sister, or Appellant's daughter] also being molested?
> A. Yes.
> Q. Which ones, or was it all three of them?
> A. It was all three of them.

*Id.* at 44-45.

On redirect examination, E.G.G. indicated that she was "nervous" to be in the courtroom, and it was not easy for her to talk about the sexual abuse. *Id.* at 47.

E.G.G.'s adoptive mother, A.G., indicated that she and her husband adopted E.G.G. on April 26, 2016. *Id.* at 49. In October of 2017, E.G.G. told A.G. that, when she visited her biological father before she was placed in the

- 3 -

foster care system, Appellant "put his thing inside of [her]." *Id.* at 50. A.G. asked E.G.G. what she meant, and E.G.G. told her that Appellant "put his penis in my hoo-ha." *Id.* She noted E.G.G. specifically provided Appellant's name, his paramour's name, and his daughter's name. *Id.* at 51. She indicated E.G.G. knew the sexual abuse occurred at Appellant's house in York, but she did not know the address; however, she could "describe everything about the house." *Id.*

A.G. testified that, prior to E.G.G. disclosing the sexual abuse to her, she had never met Appellant and knew nothing about E.G.G.'s biological father. *Id.* A.G. asked E.G.G. if she would be able to recognize Appellant if she saw his face, and E.G.G. told her that she would "never, never, never forget [his] face." *Id.* at 52. Accordingly, A.G. typed Appellant's name into Facebook, and the profiles of many different people appeared. *Id.* A.G. began scrolling through the profiles, and when A.G. opened Appellant's Facebook page, there was a photo of a man. *Id.* E.G.G. said "stop, that's him, that's him, right there, that's the man." *Id.* A.G. took a screenshot of Appellant's Facebook page and provided the screenshot to the police. *Id.* at 55.

Appellant's paramour[3] confirmed that E.G.G.'s biological father and siblings lived with her, Appellant, and her daughter for some time in York. *Id.*

_____

[3] Appellant's paramour indicated she is no longer in a relationship with Appellant; however, for the ease of discussion, we shall refer to her as Appellant's paramour.

at 65. She admitted that she would sometimes leave the children alone in Appellant's care. *Id.*

Felisha Stewart, who is a forensic interviewer with the Children's Advocacy Center, testified she has conducted approximately 500 forensic interviews with children. *Id.* at 81. She explained that a forensic interview is a one-on-one interview with a child, and police observe the interview on a monitor in a separate room. *Id.* at 82. On November 1, 2017, Ms. Stewart conducted a forensic interview with E.G.G., and she completed a report after the interview. *Id.* at 84.

The parties stipulated to the admission of Ms. Stewart's report, and the report was marked as Commonwealth's Exhibit 1.[4] *Id.* at 89. The trial court specifically informed the jury, without objection, that "when the Assistant District Attorney and counsel for the Defendant stipulate, that is, when they agree, that a certain fact or facts are true, their stipulations are evidence of those facts. You should regard the stipulated or agreed upon facts as having been proven." *Id.* at 90.

In the forensic report, Ms. Stewart explained that, in June of 2017, E.G.G.'s brother, who was at the time thirteen years old, was arrested in connection with sexual incidents involving other children. ***See***

---

[4] The Commonwealth also played a videotaped recording of the forensic interview. *Id.* at 90. Ms. Stewart's written report was a summary of the forensic interview.

- 5 -

Commonwealth's Exhibit 1 at 1. During the investigation of her brother's offenses, E.G.G. reported to A.G. that her brother had been sexually abused. *See id.* Specifically, E.G.G. reported that Appellant had "fully penetrated" her, her siblings, and Appellant's daughter when they were younger. *See id.* E.G.G. informed A.G. the abuse occurred every time the children were alone with Appellant. *Id.*

During the forensic interview, E.G.G. told Ms. Stewart that "[w]hen [she] was younger, bad things happened to [her], and [she] keeps remembering them. [Appellant] did something very wrong." *See id.* at 2. E.G.G. told Ms. Stewart that Appellant "hurt her vagina." *Id.* E.G.G. reported that, whenever Appellant's paramour left the house, Appellant would ask her how long she would be gone, and he would watch her leave the house. *Id.* Appellant would then "pull down the children's pants and then his own." *Id.* "He placed one child on the bed, and when he was done, he would say go play." *Id.*

E.G.G. told Ms. Stewart that she remembered Appellant putting his "private thing" inside her "vagina causing it to hurt really bad." *Id.* "The other children that were present were [E.G.G.'s brother,] her sister, and [Appellant's] daughter[.] He also did the same thing to each child." *Id.* E.G.G. indicated Appellant would stop his sexual activities with the children when an adult came home. *Id.* Appellant told the children not to tell anyone. *Id.*

York City Detective Kyle Hower, who is assigned to the special victims' unit, testified he interviewed Appellant on January 10, 2018, and Appellant admitted he knew E.G.G.  N.T., 3/5/19, at 109.  Appellant indicated the last time he saw E.G.G. was in approximately 2013, and he admitted that his family had lived with E.G.G.'s biological father and E.G.G.'s siblings.  *Id.* at 110.  Appellant admitted there were times when he was alone with E.G.G.  *Id.* Appellant admitted that "it was possible that he touched [E.G.G.'s] vagina on the outside of her clothing for a brief period."  *Id.* at 111.  He then admitted "he touched [E.G.G.'s] vagina on the outside of her clothing for approximately five seconds[.]" *Id.*  Appellant told Detective Hower that the touching occurred when he was wrestling with E.G.G.  *Id.*  Appellant admitted that, after he touched E.G.G.'s vagina, he "felt like [he] violated her[.]" *Id.* at 112-13.  Appellant denied that he put his penis inside of E.G.G.'s vagina.  *Id.* at 113.

York City Detective Tiffany Pitts, who is assigned to the special victims' unit, testified she interviewed Appellant on November 15, 2017, and Appellant confirmed he babysat E.G.G., her siblings, and his daughter when E.G.G.'s biological father lived with his family in York.  *Id.* at 126.  He denied he sexually abused E.G.G., but he admitted he "wrestled with the kids." *Id.* at 127.  Detective Pitts observed that Appellant was nervous and sweating during the interview. *Id.*

Detective Pitts interviewed Appellant again on January 17, 2018, after Detective Hower had interviewed Appellant.  *Id.*  Appellant admitted that,

while E.G.G. was sitting on his lap when she was a young child, he became aroused. *Id.* at 129. Appellant told the detective that E.G.G. was wearing shorts and a t-shirt, and she was playing with Play-Doh. *Id.* Appellant admitted to Detective Pitts that he "removed his penis and placed it on her vagina, and he felt the warmness." *Id.*

After he made this admission, Appellant told the detective that "if he had a gun, he would blow his brains out." *Id.* at 132. Appellant then admitted to Detective Pitts that he was sometimes alone with E.G.G. *Id.* at 130. Detective Pitts noted Appellant was very nervous and sweating during the interview. *Id.* at 132. She indicated she tried to locate E.G.G.'s biological father to conduct an interview with him, but she was unable to do so. *Id.* at 133.

On cross-examination, Detective Pitts indicated she never attempted to locate E.G.G.'s biological mother. *Id.* at 134. Appellant's trial counsel asked Detective Pitts whether she had interviewed E.G.G.'s two siblings or Appellant's daughter, who E.G.G. alleged were also sexually abused by Appellant. *Id.* at 137. Detective Pitts indicated she had interviewed the three children. *Id.* Appellant's counsel then asked Detective Pitts whether she "filed any charges against [Appellant] regarding those children." *Id.* Detective Pitts indicated "not yet." *Id.* at 139.

On re-direct examination, Detective Pitts indicated that the police were still investigating and determining whether charges would be filed against Appellant as to the other children. *Id.* at 141.

Appellant waived his right to testify, and he presented no witnesses. The jury convicted Appellant of the offenses indicated *supra*. On June 25, 2019, the trial court sentenced Appellant to an aggregate of 30.5 years to 61 years in prison. Appellant was found to not be a sexually violent predator.

On July 1, 2019, Appellant filed a timely post-sentence motion seeking a new trial based on the weight of the evidence, and by order entered on November 6, 2019, the trial court denied the post-sentence motion. Appellant filed a timely, counseled notice of appeal; however, on April 24, 2020, Appellant filed a counseled praecipe for discontinuance.

On or about April 6, 2021, Appellant filed a timely, *pro se* PCRA petition,[5] and the PCRA court appointed counsel to represent him. On March 13, 2023, counsel filed an amended PCRA petition on behalf of Appellant, and on June 30, 2023, the PCRA court issued notice of its intent to dismiss the PCRA petition without an evidentiary hearing under Pa.R.Crim.P. 907. Counsel filed

_____

[5] We note Appellant's judgment of sentence became final on April 24, 2020, when he voluntarily discontinued his direct appeal. *See Commonwealth v. McKeever*, 947 A.2d 782 (Pa.Super. 2008) (holding judgment of sentence final for PCRA purposes when appeal is discontinued voluntarily). Accordingly, Appellant's *pro se* PCRA petition, which was filed within one year of when his judgment of sentence became final, is timely. *See* 42 Pa.C.S.A. § 9545(b)(3).

a response to the PCRA court's Rule 907 notice, and on August 30, 2023, the PCRA court denied Appellant's PCRA petition. This timely appeal followed, and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant sets forth the following issue in his "Statement of the Question Presented" (verbatim):

> Whether the PCRA court erred by summarily dismissing the amended PCRA petition by concluding that trial counsel's conduct in eliciting testimony of Appellant's alleged sexual assault of three other minor victims in the same household as the victim in this sexual assault case and pending criminal prosecution thereof, at trial, without requesting any curative instruction, did not result in prejudice, and therefore, does not have merit?

Appellant's Brief at 4 (unnecessary capitalization and suggested answer omitted).

Initially, we note our standard of review for an order denying PCRA relief is limited to whether the record supports the PCRA court's determination, and whether that decision is free of legal error. **Commonwealth v. Sattazahn**, 597 Pa. 648, 952 A.2d 640, 652 (2008). "We must accord great deference to the findings of the PCRA court, and such findings will not be disturbed unless they have no support in the record." **Commonwealth v. Scassera**, 965 A.2d 247, 249 (Pa.Super. 2009) (citation omitted).

As relevant here, a PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining

process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S.A. § 9543(a)(2)(ii). In reviewing Appellant's ineffective assistance of counsel claims, we are mindful that, since there is a presumption counsel provided effective representation, the defendant bears the burden of proving ineffectiveness. *Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282 (2010).

To prevail on an ineffective assistance claim, a defendant must establish "(1) [the] underlying claim is of arguable merit; (2) the particular course of conduct pursued by counsel did not have some reasonable basis designed to effectuate his [client's] interests; and (3) but for counsel's ineffectiveness, there is a reasonable probability that the outcome of the proceedings would have been different." *Ali*, *supra*, 10 A.3d at 291 (citations omitted).

> We need not analyze the prongs of an ineffectiveness claim in any particular order.  Rather, we may discuss first any prong that an appellant cannot satisfy under the prevailing law and the applicable facts and circumstances of the case.  [C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.

*Commonwealth v. Johnson*, 635 Pa. 665, 139 A.3d 1257, 1272 (2016) (citations omitted).  *See Commonwealth v. Daniels*, 600 Pa. 1, 963 A.2d 409, 419 (2009) ("A failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.") (citation omitted)).  "A claim has arguable merit where the factual averments, if accurate, could establish cause for relief." *Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa.Super. 2013) (*en banc*) (citation omitted).

Further,

> To demonstrate prejudice, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. [A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.

*Commonwealth v. Spotz*, 624 Pa. 4, 84 A.3d 294, 311-12 (2014) (citations, quotation marks, and quotations omitted).

Moreover, as it relates to the PCRA court denying a PCRA petition without an evidentiary hearing, our Supreme Court has indicated the following:

> The PCRA court has discretion to dismiss a petition without a hearing when the court is satisfied that there are no genuine issues concerning any material fact, the defendant is not entitled to post-conviction collateral relief, and no legitimate purpose would be served by further proceedings. To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing.

*Commonwealth v. Blakeney*, 631 Pa. 1, 108 A.3d 739, 750 (2014) (quotation marks and quotations omitted). *See Commonwealth v. Jordan*, 772 A.2d 1011, 1014 (Pa.Super. 2021) (holding it is within the PCRA court's discretion to decline to hold a hearing if the petitioner's claim is patently frivolous and has no support in the record or other evidence).

Further, our Supreme Court has specifically noted that, even if a petitioner's claim has merit to warrant further review, this does not mean that a petitioner need only meet the first element of the three-prong

- 12 -

ineffectiveness test to warrant an evidentiary hearing. ***See Commonwealth v. Pursell***, 555 Pa. 233, 724 A.2d 292 (1999). Rather, "claims of ineffective assistance of counsel require a showing of prejudice, and there is no need to remand for evidentiary hearings on a claim that, while it may meet the first prong of the [ineffectiveness] test, cannot show resulting prejudice to an appellant." ***Pursell***, *supra*, 724 A.2d at 304 n.9 (citation omitted). Thus, the PCRA court does not abuse its discretion in failing to hold an evidentiary hearing where it can be determined from the record that the underlying claim has no arguable merit or that there has been no prejudice to the petitioner. ***Id.***

In the case *sub judice*, Appellant contends trial counsel was ineffective in eliciting testimony from E.G.G. on cross-examination indicating that E.G.G. had witnessed Appellant molesting her brother, her sister, and Appellant's daughter. He suggests trial counsel's error was compounded by the fact trial counsel elicited testimony from Detective Pitts on cross-examination indicating that no charges had been filed against Appellant as to the alleged crimes against the other children, but the police were investigating the matter. Thus, Appellant avers trial counsel elicited inadmissible evidence of Appellant's "other crimes, wrongs, or acts" under Pa.R.E. 404(b)(1).

Assuming, *arguendo*, there is arguable merit to Appellant's underlying claim of ineffective assistance, we conclude the PCRA court properly found the

record demonstrates Appellant did not suffer actual prejudice by his trial counsel's cross-examination of E.G.G. or Detective Pitts.

In its order denying Appellant's PCRA petition, the PCRA court relevantly held as follows:

> [Appellant's] responses to the questions asked in the three different interviews with the police kept changing. As a result, it was reasonable for the jury to conclude that [Appellant] was not being truthful with the police. While the evidence does not indicate that [Appellant] specifically admitted putting his penis inside [E.G.G.'s] vagina,…he did [tell the detective] that he "felt the warmness." Moreover, the fact that he admitted something inappropriate occurred with [E.G.G.] pertaining to his aroused penis and her vagina, plus the fact that [E.G.G.] consistently indicated (at different times and with different individuals) that there were times when [Appellant] put his penis inside her vagina and that it hurt when he did so, was sufficient evidence for the jury to find beyond a reasonable doubt that [Appellant] did, in fact, put his penis inside her vagina. Hence, any evidence presented at trial of what [Appellant] did or did not do in regard to the other children in the household is of no moment.

PCRA Court Order, filed 8/30/23, at 1-2 (citation to record omitted).

We agree with the PCRA court's sound reasoning. Here, the jury heard specific testimony from E.G.G. detailing her molestation by Appellant. Further, in statements Appellant made to the detectives, he admitted E.G.G. visited his house when E.G.G.'s biological father lived with him, and he was sometimes alone with E.G.G. His paramour, who testified at trial, confirmed these statements.

Moreover, the detectives testified that Appellant admitted to them that he wrestled with the kids, and he touched E.G.G.'s vagina on the outside of her clothing for approximately five seconds. He later admitted to the

- 14 -

detectives that he became aroused when E.G.G. sat on his lap, and on one occasion, he removed his penis, placed it on E.G.G.'s vagina, and felt the warmness.

Furthermore, the jury heard the evidence regarding E.G.G.'s forensic interview with Ms. Stewart. Therein, not only did E.G.G. recount the sexual abuse she suffered by Appellant, but she also revealed Appellant had sexually abused her brother, her sister, and Appellant's daughter. Accordingly, the record is clear that, even if Appellant's trial counsel did not ask E.G.G. on cross-examination whether she had seen Appellant molest the other children in the household, the jury heard this evidence via E.G.G.'s forensic interview. Additionally, trial counsel's cross-examination of Detective Pitts demonstrated, at most, that the police were investigating allegations of molestation as to the other children, but no charges had been filed against Appellant with respect thereto.

Accordingly, we agree with the PCRA court that there is no reasonable probability that, but for Appellant's trial counsel's alleged unprofessional errors, the result of the proceedings would have been different. **See Spotz**, **supra**. Thus, the PCRA court did not abuse its discretion in failing to hold an evidentiary hearing prior to denying Appellant's PCRA petition. **See Pursell**, **supra**.

For all of the foregoing reasons, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: <u>07/12/2024</u>